# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0529-22

A.R.P.,

    Plaintiff-Respondent,

v.

N.S.T.,

    Defendant-Appellant.

_____

> Argued December 4, 2023 – Decided January 26, 2024
>
> Before Judges DeAlmeida and Berdote Byrne.
>
> On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Middlesex County, Docket No. FV-12-2783-22.
>
> Stephanie Palo argued the cause for appellant (Buchan, Palo & Cardamone, LLC, attorneys; Stephanie Palo, on the briefs).
>
> Raul E. Menar argued the cause for respondent (Menar & Menar, attorneys; Raul E. Menar, on the brief).

PER CURIAM

Defendant appeals from the Family Part's September 6, 2023 Final Restraining Order (FRO) entered against him pursuant to the Prevention of Domestic Violence Act of 1991 (PDVA), N.J.S.A. 2C:25-17 to 35. Following a three-day bench trial, the trial court found defendant had committed the predicate act of harassment and found him in contempt for violating the temporary restraining order (TRO) but found he did not commit the predicate act of criminal mischief. It also found an FRO was necessary to protect plaintiff from further harassment. On appeal, defendant argues the trial court erred in entering a FRO because there was insufficient evidence to find a predicate act of harassment, contempt pursuant to violation of the TRO, or the FRO was necessary to prevent further harassment.

## I.

We glean the following facts from the record: the parties were in a "dating relationship" for approximately nine months from October 2021 through June 2022. Plaintiff testified she permanently ended their relationship on June 20, 2022. Defendant testified to the contrary, and simultaneously claimed the relationship was not over but he was in the process of ending it, on June 20 he wanted to see her one last time because he received a job offer in California and would likely move, but also, he wanted to work out their relationship. That night

A-0529-22

defendant and plaintiff engaged in an argument, where defendant sent plaintiff approximately 250 text messages.

Plaintiff testified she purchased an iPhone for defendant a few days prior to ending the relationship, which was the subject of their June 20 argument. In one of the voluminous text exchanges introduced into evidence, plaintiff repeatedly stated she did not want to continue communicating with defendant and wished to be left alone, but he continued to send messages accusing her of infidelity and requesting to speak on the phone. Plaintiff admitted she called defendant nine times earlier that day and sent him a text message that night stating "[g]oodnight. I love you." Defendant continued to text plaintiff asking to see her one last time.

The morning of June 21, 2022, both parties communicated through a messaging app which resulted in another argument. Later that day, defendant informed plaintiff he was going to pick up cookies and requested she meet with him. Plaintiff testified she initially agreed to meet with defendant to avoid the situation escalating, as it had in the past. But later, instead of meeting with defendant, plaintiff informed him she had to drive her father to the train station and did not want to meet with him. As a result, another argument ensued. After she dropped her father off at the train station, she repeatedly communicated to

3

defendant she did not want to meet with him. She testified she noticed defendant following her in his car as she drove home from the station. In a text exchange while driving their respective vehicles, defendant told plaintiff he wanted to talk and directed her to pull over; plaintiff responded "no," and told defendant to go home.

Plaintiff testified she was terrified when she noticed he was following her and continued driving. She engaged in evasive maneuvers by driving in circles hoping she would lose defendant in the traffic. Defendant continued to follow her and cut her off until she arrived at a gas station. Defendant then moved his vehicle next to hers. Plaintiff testified she had no choice but to park and talk to defendant. As plaintiff attempted to move her vehicle to a parking spot, defendant accelerated and hit the driver's side of her vehicle, damaging it. Both parties parked their vehicles and plaintiff called the police to report the accident. The responding officers arrested defendant for harassment. That evening, plaintiff obtained a TRO.

Defendant denied the events leading up to the accident and testified he did not follow plaintiff, she agreed to meet with him at the gas station, and he did not intend to hit her vehicle.

A-0529-22

Defendant called plaintiff through Google Voice on June 24, 2022, after the issuance of the restraining order. Approximately two minutes of the recording was played in court. The content of the portion played established defendant offered to pay for the damage to plaintiff's vehicle and apologized for causing the damage. He explained he did not intend to hit plaintiff's car and he was only trying to speak with her.

Plaintiff testified defendant asked her to dismiss the restraining order on June 24. Defendant testified he was aware plaintiff obtained a TRO against him on June 21, 2022, and admitted he called her on June 24, 2022, despite not being invited to do so.

With respect to any prior history of domestic violence, plaintiff testified approximately six months earlier, on January 17, 2022, when she informed defendant she would be staying late at work, he proceeded to call her repeatedly and yell at her. Later that day defendant blocked her vehicle as she was attempting to leave work. The next day defendant was arrested in the parking lot of plaintiff's employment and was charged with aggravated assault after plaintiff disclosed defendant's physical assault. She obtained a TRO on January 18, 2022, but subsequently dismissed it on March 1, 2022. Plaintiff testified she sent a letter, drafted by defendant, to the prosecutor recanting her allegations

A-0529-22

against defendant. She testified she loved him and "did . . . anything . . . [she] could to help get th[e] case dismissed for him . . . [because she] did not want to see him get into any more trouble." The criminal charges related to the January 18 arrest were dismissed in June 2022. Additionally, plaintiff admitted to purchasing a seat upgrade for defendant's flight to visit her in Florida after she obtained the TRO. Defendant testified he did not write the letter, but plaintiff asked him to help her prepare the letter.

Plaintiff testified she and defendant had a few arguments on January 14, 2022, which escalated while they were driving. She testified defendant wanted to be intimate but became upset after she declined. Plaintiff stated during the argument, she attempted to jump out of the vehicle, but he pulled her back in. She was terrified and attempted to exit the vehicle again while the car was moving at 15 to 20 m.p.h., but he grabbed her by the neck and hair, pulled her over the center console, and held her down. Plaintiff further testified defendant eventually stopped the vehicle in a secluded parking lot and physically assaulted her, resulting in physical injuries. Plaintiff testified defendant slapped her cheek multiple times, strangled her, grabbed her hair, and hit her back. After plaintiff arrived home, she exchanged text messages with defendant, told him she had bruises on her neck and sent a photo. Defendant responded, "[s]o how to control

6

you? You were tryna jump [f]rom running car." Plaintiff testified defendant told her to hide her injuries from her mother, which is reflected in their text message exchange. Plaintiff admitted she told defendant she wanted to kill herself earlier that day because defendant threatened to end the relationship. Plaintiff submitted four photos into evidence of the injuries she sustained from the alleged attack, which the court commented showed clear injury. Defendant testified the physical injuries were a result of keeping plaintiff from jumping out of the vehicle.

On March 11, 2022, defendant and plaintiff had another argument. On that occasion, plaintiff alleged defendant grabbed her by the neck and hair, pulled her over the center console, and held her down while choking her. She later admitted to exchanging sexually explicit texts with defendant on March 12, 2022, regarding them engaging in rough sex, but did not recant her allegations that defendant assaulted her the day before.

After reviewing all of the testimony and evidence, and making detailed credibility determinations, the trial court entered an FRO on September 6, 2022. Regarding the car accident on June 21, 2022, the court found the predicate act of criminal mischief was not satisfied because it did not find defendant acted

A-0529-22

purposefully, knowingly, or recklessly. See N.J.S.A. 2C:25-19(a)(10). The court reasoned "the accident was more akin to negligence."

However, the trial court found defendant committed the predicate act of harassment and also violated the TRO. See N.J.S.A. 2C:25-19(a)(13); N.J.S.A. 2C:33-4; N.J.S.A. 2C:25-19(a)(17); N.J.S.A. 2C:29-9(b). The court clarified the predicate act of harassment was viewed in light of what occurred on June 21, 2022, and the violation of the TRO focused on defendant's conduct on June 24, 2022. The court made clear the predicate act of harassment stood alone in its review and excluded the prior history between the parties as it was not helpful.

The court found on June 21, 2022, plaintiff expressed to defendant she did not want to have contact with him that afternoon and did not want to meet with him. The court determined defendant would not take no for an answer, and defendant followed plaintiff from the Metuchen train station to Edison. It found, based on the back-and-forth text messages, defendant sent desiring, demanding, and questioning messages, including: "Who are you talking to? How come you're not talking to me? Do you have another boyfriend? Why won't you see me? You made plans." Meanwhile, plaintiff firmly expressed she did not want to meet or see defendant, did not want to talk, and wanted to go home. The court noted, despite this, defendant continued to follow her. When plaintiff pulled

through a gas station to avoid defendant, he caused his car to hit plaintiff's car, resulting in extensive property damage. Although it found defendant did not intend to use his car as a ram, it determined the act:

> was an impetuousness on behalf of the defendant. He was not going to take no for an answer, and he was going to make sure that he followed [plaintiff] to the point where he got either the answer to his question, the meeting he was hoping for, or demanding, or whatever the case may be.

It reasoned the testimonies and conduct at trial led it to find defendant's act of following plaintiff to the point where he confronted her at the gas station and negligently caused an accident between their cars was alarming conduct and it did not satisfy any other purpose.

Regarding violating the TRO, the court found defendant knew he was served with the TRO, called plaintiff on June 24, 2022, and during the call he implored, begged, cajoled, and requested plaintiff drop the TRO.

The trial court then evaluated the factors set forth in N.J.S.A. 2C:25-29(a)(1)-(6), pursuant to the standard expressed in the second prong of <u>Silver</u>, 387 N.J. Super. 112 (App. Div. 2006), and considered whether an FRO was necessary to protect plaintiff from the threat of future violence or prevent further harassment.

A-0529-22

The court reviewed the parties' history in detail and found "for every text message that seem[ed] to implicate the prior history of domestic violence, the defendant has one that shows just the opposite." It found the parties engaged in "profoundly immature communications" and their back-and-forth defied logic and lacked credibility, which resulted in the court not finding prior history helpful in its analysis. The court specifically stated "[s]o Silver v. Silver requires an analysis of the prior history. But I don't -- I've never felt that the prior history carries the day one way or the other. It is a factor to be considered."

The court then reviewed the events on June 21, 2022, and detailed its findings. Ultimately it found from the time of defendant's text message at 2:53 p.m. to the time of collision, "plaintiff was filled with fear and anxiety over the level of control . . . defendant would attempt to exhibit over her, over the non-meeting." As a result, the court determined the second prong was satisfied. The court acknowledged plaintiff did not demonstrate the ability to completely end the relationship; however, on June 21, 2022, between 3 and 5 p.m., plaintiff showed she was decisively "concerned and fearful over the anxiety" because, despite her insistence to be left alone, defendant relentlessly sent her messages of accusations.

II.

Our review of an FRO is generally limited.  C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020).  In matters involving domestic violence, the Supreme Court has held the findings of a trial court "are binding on appeal when supported by adequate, substantial, credible evidence."  Cesare v. Cesare, 154 N.J. 394, 411-12 (1998).  Further, "[d]eference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'"  Cesare, 154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)).  Because the trial court is better positioned to evaluate witness credibility and qualifications, conclusions on credibility are given great weight unless clearly lacking in reasonable support.  Id. at 414.

Our review of questions of law "are not entitled to that same degree of deference if they are based upon a misunderstanding of the applicable legal principles."  R.G. v. R.G., 449 N.J. Super. 208, 218 (App. Div. 2017) (quoting N.T.B. v. D.D.B., 442 N.J. Super. 205, 215-16 (App. Div. 2015)).

When determining whether an FRO pursuant to the PDVA should issue, a trial court must make two distinct determinations.  Silver v. Silver, 387 N.J. Super. at 125-27.  First, the court must determine whether the plaintiff has

proven, by a preponderance of the credible evidence, that one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred. Id. at 125.

With respect to the predicate act of harassment, N.J.S.A. 2C:33-4 requires the perpetrator act "with [the] purpose to harass another." Such a finding "may be inferred from the evidence presented" but "[c]ommon sense and experience may inform that determination." State v. Hoffman, 149 N.J. 564, 577 (1997). It may also be inferred from the parties' history. J.D. v. M.D.F., 207 N.J. 458, 487 (2011).

Defendant argues the court improperly applied the law on harassment. He contends "the court did not give enough weight to the prior conduct and statements by the parties" when assessing "whether defendant acted with purpose to harass." Defendant cites to Pazienza v. Camarata, 381 N.J. Super. 173, 183 (App. Div. 2005), arguing the court is required to consider the prior communications and conduct of the parties in the context of domestic violence. Defendant concedes it was "arguably understandable [the court] found defendant's conduct toward plaintiff on June 21, 2022 [was] unacceptable." However, he argues his conduct was not committed with an intent to harass because he was acting in accordance with the parties' typical conduct throughout the relationship. He characterizes the mutual conduct in the relationship as

"either party actively pursuing the other, because [it] was . . . part of the parties['] passion and [the] manner of communication they engaged in." Defendant reasoned he did not have the purpose to harass plaintiff because he "reasonably believed . . . [she] wanted him to follow her so . . . they could ultimately speak about the contretemps of the night before which ended with the parties saying they loved each other and that they would meet the next day."

Defendant reasoned that past conduct, such as plaintiff obtaining a TRO in January 2022 and a few weeks later inviting him to Florida, paying for his plane ticket upgrade, and requesting the prosecutor dismiss the TRO, is evidence of why he would not have the purpose to harass. In his reply brief, defendant contends "merely knowing that someone would be annoyed, as opposed to having a conscious objective to annoy, is insufficient to prove a purpose to harass." We disagree as defendant's arguments are belied by the extensive record.

There is sufficient credible evidence in the record to establish defendant harassed plaintiff on June 21, 2022. Although she initially agreed to meet him, she later told him she would not be meeting him. The text messages in evidence demonstrate she was unequivocal she did not want to see him. Despite this, defendant showed up at the train station, and followed defendant, eventually

13

causing an accident while sending her harassing text messages the whole time. His purpose was to harass her until he wore her down and she agreed to speak with him.

The prior history of the parties, and defendant's suggestion that the events of June 21, 2022, do not demonstrate harassment because they were consistent with the parties' pattern and "passionate" course of conduct throughout their relationship is unpersuasive. The prior history demonstrates an often volatile, immature relationship, with specific instances where defendant sought to control plaintiff. The fact that plaintiff acquiesced many times to his control, and he was able to convince her before, is of no moment in determining whether defendant intended to harass her on June 21, 2022.

Moreover, plaintiff need not prove a "course of conduct" to establish harassment. In specific circumstances, one act may meet the definition of harassment. Hoffman, 149 N.J. at 580 ("[S]ubsection (a) proscribes a single act of communicative conduct when its purpose is to harass."); State v. J.T., 294 N.J. Super. 540, 545 (App. Div. 1996) (holding a course of alarming conduct "does not require any minimum amount of time . . . ."). Defendant's failure to leave plaintiff alone and following her in his car until she agreed to speak with

him constitutes harassment and we discern no reason to disturb the trial court's finding and affirm.

Likewise, there is no support in the record for defendant's argument he did not violate the TRO by calling plaintiff after being served with the TRO, merely because plaintiff spoke with him. Defendant admitted he violated the TRO and the court found defendant attempted to convince plaintiff to drop the restraining order. Defendant's argument warrants no further discussion.

If a court finds a predicate act occurred pursuant to N.J.S.A. 2C:25-19(a), "the judge must determine whether a restraining order is necessary to protect the plaintiff from future danger or threats of violence." D.M.R., 467 N.J. Super. at 322. "Although this second determination — whether a domestic violence restraining order should be issued — is most often perfunctory and self-evident, the guiding standard is whether a restraining order is necessary, upon an evaluation of the factors set forth in N.J.S.A. 2C:25-29(a)(1) to -29(a)(6), to protect the victim from an immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 127. N.J.S.A. 2C:25-29 provides "[t]he court shall consider but not be limited to" six factors, including the previous history of domestic violence between the parties. "[W]hether the victim fears the defendant" is an additional factor the trial court may consider. G.M. v. C.V., 453 N.J. Super. 1,

13 (App. Div. 2018). The court must determine, pursuant to the totality of the circumstances, whether the FRO is necessary "to protect the victim from an immediate danger or to prevent further abuse." Silver, 387 N.J. Super. at 127; C.C., 463 N.J. Super. at 436; see also N.J.S.A. 2C:25-29(b) ("the court shall grant any relief necessary to prevent further abuse."). The inquiry is necessarily fact specific. Silver, 387 N.J. Super. at 127-28 (remanding for further fact finding).

Reviewing the totality of the circumstances, the probability for further abuse to plaintiff is supported in the record, and there is sufficient credible evidence supporting the finding that an FRO is necessary, particularly in light of the trial court's credibility determinations and its finding defendant violated the TRO.

Defendant's own admissions regarding violating the TRO, the parties' volatile history, and the court's detailed credibility determinations regarding defendant's inability to control his behavior, all support the trial court's finding of a risk of imminent harm or risk of future abuse.

The court made detailed credibility determinations, finding plaintiff "conducted herself appropriately" and "was responsive to questions generally." It found she did not "duck questions" and responded properly during direct and

16

cross-examination, which gave her some credibility at trial.  Defendant's conduct, it found, ran counter to that of a credible witness.  The court found:

> defendant presented somewhat of a different persona [than plaintiff]. He wouldn't sit down, even when his own attorney asked him to. He was -- he was hellbent . . . on giving explanations when no questions were pending. He . . . was not always responsive to the questions that were asked. . . . [A]t some point he wasn't going to answer the question, but he was going to use the question as a[n] opportunity to . . . make a speech. And . . . [the court] was left with the impression that . . . defendant just doesn't take no for an answer. And when he feels that he wants something, needs something, or is entitled to something, he's going to get it. And [the court thought] that[ was] what happened on June 21[, 2022].

From our review of the evidence, the governing statutes, and controlling case law, we conclude there is sufficient, credible evidence in the record to support the trial court's finding final restraints were necessary for plaintiff's protection.

To the extent we have not addressed defendant's remaining arguments, we find they lack sufficient merit to warrant discussion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

17

A-0529-22